THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA     ]

    ]

v.                              ]       1:23-cr-118-SE-AJ-01

    ]

    ]

TYLER ANDERSON

## **MOTION TO DISMISS**

The defendant, Tyler Anderson, through his counsel, Dorothy E. Graham, AFPD, files this motion respectfully requesting that the Court dismiss Count One of the indictment on the basis that the alleged conduct constitutes speech protected by the First Amendment, rather than a true threat within the meaning of 18 U.S.C. § 875(c).

## OFFENSE

On or about December 20, 2023, a grand jury returned a three-count indictment charging Mr. Anderson with Interstate Threatening Communications in violation of 18 U.S.C. § 875(c). Count One alleges that on November 22, 2023, Anderson transmitted threatening texts to Presidential Candidate #1 ("PC1"). Count Two alleges that on December 6, 2023, Anderson transmitted threatening texts to Presidential Candidate #2 ("PC2"). Count Three alleges that on December 8, 2023,

1

Anderson transmitted threatening text messages to Presidential Candidate #3 ("PC3").

FACTS[1]

Between July 14, 2022, to December 8, 2023, Tyler Anderson received at least 30 political text messages on his phone.  Because PC3 was holding an event in Portsmouth on December 11, 2023, PC3 campaign staffers sent out text messages notifying voters of this event.  Specifically, on December 8th, the staffers sent a text from #xxx-xxx-1292 ("1292)" to #xxx-xxx-8914 ("8914"). Based on the content of the messages received from 8914 - a number the campaign associated with Anderson - PC3 contacted the Portsmouth Police Department and provided the text message sent out to 8914 and the two replies received from that number.

On December 8th into December 9th, agents obtained information from Verizon Wireless to corroborate Anderson's association with 8914, including records that confirmed 8914 sent two messages to 1292 at 10:06am on December 8.  Utilizing ping information, the agents also confirmed that Anderson's last known address was within 75 meters of the ping location.  With this information, Special Agent Adam Howe applied for a search warrant.

---

[1] Facts are based from the discovery provided by the Government.

On December 9, 2023, agents went to Anderson's home and arrested him. They found Anderson's phone on his bed and searched through the deleted folder within the phone, finding the December 8th text to PC3 as well as the text messages outlined in Counts One and Two of the Indictment.  Agent McBrearty searched other messaging applications on the phone, open internet tabs, an email folder and did not find anything derogatory.

Anderson was transported to the Dover Police Department where agents conducted an audio-videotaped interview.  Anderson confirmed he sent texts to PC3 that were "over the top", that he did so to make the messages stop, and that he had no intent to follow through on the statements he made.

## LAW AND ARGUMENT

### Introduction

Courts must interpret statutes criminalizing forms of pure speech under the First Amendment, which protects socially valuable expression that is not clearly outweighed by the interests in its proscription. *See Watts v. United States*, 394 U.S. 705, 707 (1969), *Counterman v. Colorado*, 600 U.S. 66, 73-74 (2023). Accordingly, the First Amendment protects neither obscenity ("valueless material 'appeal[ing] to the prurient interest' and describing 'sexual conduct' in 'a patently offensive way'"), defamation (false statements harming another's reputation), nor incitement ("statements 'directed [at] producing imminent lawless action,' and likely to do so"). *Counterman*, 600 U.S.  at

3

73. Additionally, the First Amendment permits prosecution of true threats, which represent "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *See id* at 74, *Virginia v. Black*, 538 U.S. 343, 359 (2003)).

A true threat is distinguished from expression such as offensive political speech or hyperbole, which, "when taken in context[,] do not convey a real possibility that violence will follow." *See Counterman*, 600 U.S. at 74 (quoting *Watts*, 394 U.S. at 708). Identifying a true threat requires consideration of contextual factors, including the "speaker's tone, the audience, the medium for the communication, and the broader exchange in which the statement occurs." *Id.* at 114 (Barrett, J., dissenting). Accordingly, the Supreme Court has extended First Amendment protection to a conditional commitment to shoot the President at a rally against police brutality (*Watts*, 394 U.S. at 708), cross-burning absent intimidatory intent at a rally of aggrieved Ku Klux Klan members (*Black*, 538 U.S. at 376), and a call to "break [the] damn neck" of individuals crossing a boycott line (*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902–925 (1982)).

### Courts May Dismiss Indictments Targeting First Amendment Speech

Although the determination of whether an alleged expression constitutes a true threat is usually left to a jury, some cases may be so clear that courts may resolve them as a matter of law. *United States v. Clemens*, 738 F.3d 1, 13 (1st Cir. 2013), *United States v.*

*Stock*, 728 F.3d 287, 298 (3rd Cir. 2013). Where "no reasonable jury could conclude the statements were threats," courts may grant a defendant's motion to dismiss. *Clemens*, 738 F.3d at 12-13. The political nature of Mr. Anderson's alleged conduct, which occurred in response to dozens of text messages from presidential campaigns, distinguishes the presently charged acts from those in First Circuit cases involving non-political speech. See *Clemens*, 738 F.3d at 13 n.11 (affirming that a reasonable jury could finding a true threat partially because the defendant conceded his statements were not political), *United States v. Whiffen*, 121 F.3d 18, 22 (1st Cir. 1997) (affirming the denial of a motion to dismiss where the defendant conveyed a true threat and did not claim his statements were political), and *United States v. Fulmer*, 108 F.3d 1486, 1492-93 (1ˢᵗ Cir. 1997) (concluding that finding the defendant made a true threat would not violate the First Amendment because the defendant did not criticize any government figure). As demonstrated by *Watts*, as well as more recent decisions concerning motions to dismiss, no reasonable juror could find that Mr. Anderson made true threats given the political nature and context of his messages.

In *Watts*, the Supreme Court determined whether a defendant's statement, made within a group discussion concerning police brutality and education, constituted a prosecutable true threat or political hyperbole protected under the First Amendment. *See* 394 U.S. 705, 706-08 (1969). In response to hearing the claim that

young people should receive more education before voicing their opinions, the

defendant allegedly said:

> "They always holler at us to get an education. And now I have already
> received my draft classification as 1-A and I have got to report for my
> physical this Monday coming. I am not going. If they ever make me
> carry a rifle the first man I want to get in my sights is L.B.J."

*Id* at 706. The crowd laughed in response. *See id* at 707. The Court observed the

statement's conditional language, its utterance during a political debate, and the

innocuous reaction of listeners, concluding that the defendant did not make a true

threat but employ "a 'kind of very crude offensive method of stating [] political

opposition to the President.'" *See Watts*, 394 U.S. at 708. Observing a "profound

national commitment to the principle that debate on public issues should be

uninhibited, robust, and wide open, and that it may well include vehement, caustic,

and sometimes unpleasantly sharp attacks on government and public officials," the

Court concluded that the First Amendment protects political hyperbole, which is

often "vituperative, abusive, and inexact." *Id.*

### Mr. Anderson's Did Not Make a True Threat

Consideration of Mr. Anderson's audience and the broader exchange in which

his statements occurred establishes that the alleged messages do not constitute true

threats. First, whether Mr. Anderson's messages even had an audience is uncertain;

unfamiliar numbers sent the campaign messages to Mr. Anderson, often appearing

automated and without an identifiable author. For example, on November 22, 2023, a number listed as xxx-xxx-5223 texted Mr. Anderson that "Tyler, [PC1] would love to see YOU at [their] town hall in Derry, NH, on Nov. 28! Don't miss out, RSVP today…Stop [sic] to stop." That any of Mr. Anderson's replies would register with the campaign's mass-messaging system or reach any reader was uncertain. Second, Mr. Anderson allegedly responded only after receiving at least thirty text messages from three different presidential campaigns between July 14, 2022, and December 8, 2023. This protracted campaign outreach occurred amidst the extremely polarized political climate of a presidential election year in an early primary state.

Against this context, Mr. Anderson's messages are similar to the hyperbole of *Watts* ("If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.") and *Claiborne* (we will "break [the] damn neck" of boycott breakers). 394 U.S. at 708, 458 U.S. at 902. In Count One, the indictment alleges that Mr. Anderson sent a series of text message to PC1 containing a "threat to 'impale' and 'disembowel'" the candidate. The indictment omitted relevant language that meaningfully qualified Mr. Anderson's response to the campaign outreach as crude opposition; specifically, that PC1 "deserved to get impaled" and that "disembowelment would work too."

In contrast, the court denied a motion to dismiss an 18 U.S.C. § 875(c) in *United States v. Ziobrowski*. No. CR 18-10250-DJC, 2019 WL 3306802 (D.Mass. 2019). There, the defendant moved to dismiss an indictment alleging that on July 2, 2018, he

tweeted, "I am broke but I will scrounge and literally give $500 to anyone who kills an ice agent. @me seriously who else can pledge get in on this let's make this work." *Ziobrowski*, 2019 WL 3306802 at 1. The court observed that the defendant spent months promoting violence against law enforcement officers. *See id* at 3. Although the defendant claimed his statement represented political speech, the context of his tweet led the court to conclude that a reasonable jury could determine the defendant made a true threat.[2] *See id.*

Nothing suggests that Mr. Anderson aimed to carry out such conduct, unlike *Ziobrowski*, where the defendant offered to pay a third-party to kill a law enforcement officer. *See* 2019 WL 3306802 at 1. "When taken in context," Mr. Anderson's alleged text messages do not "convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74. Rather, the alleged messages indicate Mr. Anderson's desire that the campaign stop texting him. A reasonable juror could not conclude that such conduct represents a true threat.

Furthermore, the Supreme Court's most recent discussion of true threats in *Counterman v. Colorado* indicates that Mr. Andersen's texts, while crude forms of political hyperbole, deserve First Amendment protection. *See* 600 U.S. 66, 88, 104 (2023) (Sotomayor, J., concurring) (distinguishing the high First Amendment stakes of

---

[2] On December 6, 2019, a jury acquitted the defendant. *See United States v. Ziobrowski*, Document 90, Judgment of Acquittal, 18-10250-DJC (D.Mass 2019).

a true threats prosecution from a case involving true threats and stalking). Prosecuting charged political speech in a society that suffers from "intense polarization" might overcriminalize the expression of certain groups. *Id* at 88, 104. Religious and cultural minorities are especially vulnerable because others may easily misinterpret their speech; this logic extends to someone in mental health crisis. *See id* at 88.

Caution is especially warranted in prosecutions of online speech, which "lack many normal contextual clues, such as who is speaking, tone of voice, and expression" that may bear upon whether a statement constitutes a true threat. *See id* at 87. Prosecuting Mr. Anderson's alleged statements runs the risks of misinterpretation and overcriminalization that Justice Sotomayor sought to deter. Accordingly, this Court should dismiss Count 1 of the indictment.

No separate memorandum of law is attached as all points and authorities are contained herein.

Wherefore the defendant through counsel respectfully moves the Court to schedule a hearing, and after hearing dismiss Count 1 of the indictment and for such other relief as may be deemed just.

The Government, through AUSA Charles Rombeau, objects.

Respectfully submitted,

Date: January 31, 2024                 */s/ Dorothy E. Graham*

Respectfully submitted,

Dorothy E. Graham
Assistant Federal Defender
22 Bridge Street
Concord, NH
603.226-7360

E-mail: Dorothy_Graham@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that the above document was served on January 31, 2024 to the following person and in the manner specified herein: electronically served through ECF AUSA Charles Rombeau.

*/s/ Dorothy E. Graham*

Dorothy E. Graham